# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| JULIE O'SHAUGHNESSY, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) | |
| | ) | CASE NO. 1:19-CV-412 |
| PLAINTIFF. | ) ) | |
| v. | ) ) | CLASS ACTION |
| YOUNG LIVING ESSENTIAL OILS, LC D/B/A YOUNG LIVING ESSENTIAL OILS, THE YOUNG LIVING FOUNDATION, INC., MARY YOUNG, JARED TURNER, BENJAMIN RILEY, and CO-CONSPIRATORS, | ) ) ) ) ) ) ) | PURSUANT TO 18 U.S.C. §§ 1961-1968 |
| DEFENDANTS. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Julie O'Shaughnessy ("Plaintiff" or "Julie"), individually and on behalf of all those similarly situated, files her complaint against Defendants Young Living Essential Oils, LC d/b/a Young Living Essential Oils ("Young Living"), The Young Living Foundation, Inc. (the "Foundation"), Mary Young ("Young"), Jared Turner ("Turner"), Benjamin Riley ("Riley") and Jane and John Doe co-conspirators[1] for damages and other relief under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), and alleges as follows:

---

[1] Collectively, Young Living, the Foundation, Young, Turner, Riley, and unknown co-conspirators are referred to as "Defendants" throughout. Plaintiff fully expects to learn the identities of additional co-conspirators through the conduct of discovery and hereby reserves her right to amend this complaint to add additional Defendants.

# I.
## INTRODUCTION

1.     Young Living operates an illegal pyramid scheme created under the guise of selling essential oils for quasi-medicinal purposes.  In truth, Young Living is nothing more than a cult-like organization falsely peddling the ever-elusive promise of financial success and an alternative lifestyle.

2.     Julie O'Shaughnessy, and hundreds of thousands of putative class members just like her, paid and lost hundreds (and in some cases thousands) of dollars to become Young Living Essential Rewards enrollees ("Members") based upon the promise of financial health (which Young Living calls "abundance") and physical health, all through its brand of essential oils.  Of course, the promise of riches and alternative health remedies are simply the hook used to grow Young Living's base of recruits, which is the true purpose of the organization and the source of immense profits—for the Defendants, not the Members.

3.     Young Living falsely represents to its Members that participation in Young Living—which necessarily requires regular monthly payments—will result in spiritual and material riches as long as they continue to solicit additional recruits to become Members of the Young Living family.

4.     But that promise is nothing more than a pipe dream for Young Living's millions of Members.   In reality, Defendants have created nothing more than an unlawful pyramid scheme—the cornerstone of which is Young Living's emphasis on new member recruitment over the sale of products.

5.     To wit, based on Young Living's own public disclosures, 94% of total Members earn an average of $1 per month in sales commissions, and more than half of those who joined in 2016 alone made no commissions at all.  Worse still, these same Members were nevertheless

required to spend hundreds of dollars on Young Living products to remain active Members.  As such, the average *loss* per Member in 2016 was approximately $1,175.  At bottom, the only way to make any money through Young Living is to get paid for recruiting new Members and building a "down line"—which is a telltale characteristic of an unlawful pyramid scheme.

6.      In short, Defendants have conducted business in an unlawful fashion and Plaintiff and the putative class seek to hold them accountable for such behavior.

## II.
### PARTIES

7.      Plaintiff and putative class representative Julie O'Shaughnessy is a resident of Austin, Texas.  In 2015, Julie became a Young Living representative after being recruited by a friend at a party designed for that purpose.  Julie paid $100 to become a Young Living Member, and has since expended thousands of dollars as part of her participation in the Young Living scheme, all of which is now lost.

8.      Defendant Young Living Essential Oils, LC is a Utah limited liability company with its principal offices and headquarters located in Lehi, Utah.  Young Living claims to "create abundance" for its Members.  In reality, Young Living creates abundance only for itself, by selling prospective Members on its fantastical and cult-like culture—all of which revolves around the self-authored mythology of its recently deceased founder, Gary Young, and his fraudulent peddling of essential oils as a medicinal remedy.

9.      The Young Living Foundation is a Utah non-profit corporation, and an affiliated entity created by founder Gary Young.  The Foundation states it "plays a major role in fulfilling Young Living's vision of bringing essential oils to every home in world."  Putting aside the absurdity of the goal itself, the Foundation is nothing more than an additional means for Defendants to promote their pyramid scheme as a worthwhile "Lifestyle."

10.     Defendant Mary Young is an individual and a citizen of the State of Utah. Defendant Mary Young is Young Living's chief executive officer, and Gary Young's widow. According to written reports, Ms. Young has a long history of involvement with other multi-level marketing ("MLM") companies, and authored "D. Gary Young: The World Leader in Essential Oils," a central piece of the Young Living cult's lore, which in turn is critical to the Defendants' schemes.[2]

11.     Defendant Jared Turner is an individual and a citizen of the State of Utah. Defendant Jared Turner is Young Living's chief operating officer.  According to his biography, Mr. Turner has spent more than two decades working for various MLM schemes.

12.     Defendant Benjamin Riley is an individual and a citizen of the State of Utah. Defendant Benjamin Riley is Young Living's chief sales officer.  Prior to joining Young Living, Riley was affiliated with such MLM schemes as 4Life and Melaleuca.

13.     Numerous other Jane and John Does are high-level members of the Young Living pyramid scheme, and co-conspirators of Defendants Young, Turner, and Riley.  As with all pyramid schemes, the earliest members of Young Living are likely insiders who have continued to fraudulently promote the scheme for their own personal enrichment.

### III.
### ADDITIONAL NON-PARTIES

14.     Gary D. Young, who died in early 2018, was the founder of Young Living.

15.     Mr. Young's colorful 30 year history as the founder and CEO of Young Living included such memorable moments as:  (a) being prosecuted for practicing medicine without a

---

[2] According to Mr. Young's biography, while working as a logger in the State of Washington, Mr. Young was struck by a falling tree, which resulted in a fractured skull, ruptured spinal cord, and nineteen broken bones. After being told he would never walk again, Mr. Young claims to have healed himself through a 252-day dietary regimen of nothing but water and lemon juice.  By comparison, the medicinal qualities and potential for financial rewards ascribed to essential oils by Young Living are not nearly as believable.

license on multiple occasions; (b) running a now shuttered "Young Living Research Clinic" in Springville, Utah, (subsequently replaced by a Young Living clinic in Ecuador) where he employed a quack physician convicted of manslaughter; and (c) allegations he nearly killed a patient through vitamin C infusions which caused renal failure.[3]

## IV.
### JURISDICTION & VENUE

16.     Defendants are subject to the jurisdiction of this Court because each continuously and systematically engaged in and continues to engage in business in Texas.

17.     In accordance with 18 U.S.C. § 1965(a), each the Defendants are subject to this Court's personal jurisdiction because they "transact affairs" in the Western District of Texas. And pursuant to 18 U.S.C. §§ 1965(b), (d), each of the Defendants may be served with process wherever they may be found.

        a.      Under these RICO provisions, Young Living may be served with process by serving its registered agent, Corporation Service Company, 15 West South Temple, Suite 1701, Salt Lake City, UT 84101;

        b.      The Young Living Foundation may be served with process by serving its registered agent, Corporation Service Company, 15 West South Temple, Suite 1701, Salt Lake City, UT 84101;

        c.      Mary Young may be served with process at 1831 N Fort Canyon Rd, Alpine, UT 84004 or at her place of business, 3125 Executive Parkway, Lehi, Utah 84043;

---

[3] *See* Rachel Monroe, *How Essential Oils Became the Cure for Our Age of Anxiety*, THE NEW YORKER, October 9, 2018.  Mr. Young was also the subject of an investigative report in which workers at his Tijuana based "medical clinic" represented to an undercover investigative reporter from the Los Angeles Times (who had provided the clinic with a blood sample) that he had "aggressive cancer and liver dysfunction" which required immediate, expensive therapy at the clinic.  When the clinic workers were confronted with the fact the blood sample was provided by a healthy tabby cat named "Boomer," they responded the cat likely had leukemia.  According to Ms. Moore's article, Boomer is alive and well, despite Young Living's gloomy diagnosis.

      d.     Jared Turner may be served with process at 12686 S Wilding Way, Draper, UT 84020 or at his place of business, 3125 Executive Parkway, Lehi, Utah 84043; and

      e.     Benjamin Riley may be served with process at 2873 Elk Horn Ln, Sandy, UT 84093 or at his place of business, 3125 Executive Parkway, Lehi, Utah 84043.

18.     Alternatively, each of the Defendants are subject to personal jurisdiction in this Court under the Texas Long Arm Statute because each one either (i) engages in business in Texas but does not maintain a regular place of business in Texas or a designated agent for service of process, and/or (ii) committed a tort in Texas.  Defendants have purposefully availed themselves of the Texas forum by intentionally directing its fraudulent pyramid scheme in Texas. Among other things, Defendants have a website presence that targets Texas residents like Julie; they sell and ship product to Texas Members like Julie; they market their pyramid scheme in Texas; and they sponsor conferences in Texas, where Members are encouraged to recruit new Members in furtherance of the illegal pyramid scheme.  Thus, each of the Defendants may also be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, TX 78701, as his/her/its agent for service of process under the Texas Long Arm Statute.  The Texas Secretary of State may then forward notice of the summons to each of the Defendants at the addresses set forth in the preceding paragraph.

19.     The Court also has jurisdiction over this action under 28 U.S.C. § 1331 as it presents one or more federal questions.

20.     This Court also has jurisdiction over this action under 28 U.S.C. § 1337 because it concerns the regulation of interstate commerce.

21.     Venue is proper in this District, and this Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Defendants are

citizens of, residents of, are found within, have agents within, are doing business in, and/or transact their affairs in this District, and the activities of the Defendants which give rise to the claims for relief occurred in this district.  Moreover, Plaintiff is also a resident of this District.

## V.
### FACTS

**A.**     **How the Young Living Pyramid Scheme Works**

22.     Young Living purports to sell "essential oils" via a complicated MLM operation. The complex and intentionally hard-to-understand multi-layer compensation/participation structure of Young Living is a hallmark of illegal MLM pyramid schemes.

23.     While many consider every MLM company to be inherently fraudulent, the Federal Trade Commission has outlined some guidelines it considers critical to distinguishing an illegal pyramid scheme from a "legitimate" MLM.  For example, a legal MLM program must structure its compensation so that the members are paid primarily based on sales of goods and/or services to those outside the plan.  By contrast, an illegal pyramid scheme overwhelmingly rewards its participants for recruitment of new members rather than product sales made to persons outside the pyramid structure.

24.     Here, the Defendants are operating an illegal pyramid scheme, in no small part because the financial success of any Young Living Member is overwhelmingly dependent on the recruitment of new people into the Young Living sales force—*i.e.,* the defining characteristic of an illegal pyramid scheme versus a legitimate MLM company.  Specifically, Young Living sells the fleeting promise of financial rewards—what it calls "abundance"—through the unrelenting recruitment of new Members.  Young Living's very structure ensures that every new Member will almost certainly lose large sums of money, chasing the elusive promise of "abundance" by trying to recruit additional new Members from an ever-shrinking pool of available candidates.

25.     And Young Living's Members' losses are compounded by its structure, which requires its Members to continuously purchase (and as a result, hold) an ever-growing inventory of unused product, in direct violation of the 70/30 rule established in the FTC's 1979 *Amway* ruling.[4]

**(1)     Young Living Encourages the Recruitment of Members over Retail Sales**

26.     In order to join Young Living, new Members must first purchase a "starter kit" from an existing Member.  A basic starter kit consists of an order of a single, 5 ml bottle of "stress away" essential oil, samples of other various oils, an atomizer, sample business cards, "Essential Oils Magazine," "Essential Edge News," and miscellaneous other "resources" for new Members.  The cost of a starter kit ranges from $100 (for a basic kit) up to $260 for "premium" kits.  The vast majority of new Members opt for the premium kits, largely because the recruiters are actively encouraged by Young Living to push the premium kits over the starter kits.

27.     Once a new Member enrolls, Young Living pays a cash bonus to the "up line" Member who recruited the new "down line" Member to incent its existing Members to recruit as many new down line Members as possible.[5]

28.     The payment of the cash enrollment bonus, however, is not the only manner in which Members are actively and repeatedly encouraged to focus their efforts on the recruitment of new Members.

29.     A cursory review of Young Living's compensation structure makes abundantly clear recruiting is prioritized over the sale of product in the Young Living system—to a fault.[6]

---

[4] *See In the Matter of Amway Corporation*, 93 F.T.C. 618, 679-80 (1979).

[5] When Julie joined in 2015, the cash bonus was $50.  Today it is $25.

[6] A true and correct copy of the Young Living Compensation Plan is attached as **<u>Exhibit A</u>**.

30.     As Members attempt to move through the Young Living compensation system, their only opportunity to earn enough income to cover the cost of Membership is by recruiting new Members and then encouraging their down line Members to also recruit aggressively.  And this undoubtedly is by design.

31.     To move up the pyramid and to be eligible to receive commissions, Young Living Members must enroll in the Essential Rewards ("ER") program and maintain their active enrollment in ER by purchasing a minimum amount of Young Living products on a monthly basis, which is referred to as personal volume or "PV."

32.     Young Living gives each product a PV value, where each point is roughly equivalent to each dollar of goods purchased.  So a $10 product would typically have a PV value of 10.   The minimum PV value to maintain active enrollment in ER is 50, but to earn commissions on a downline, the minimum PV increases to 100.  In Julie's case, she purchased at least $100 of Young Living product each month in order to maintain her eligibility to earn commissions.

33.     The products that comprise a Member's PV are purchased at a 24% discount and, at least theoretically, can be resold by each Member, who could retain any difference between the discount and the retail price for which they might sell the product.  But there is no real incentive for a Member to try to become a reseller of oils as opposed to becoming a recruiter of more down line members for two important reasons.  First, there's no real opportunity for a Member to profit from becoming a reseller of oils at a mark-up because anyone can buy the oils at the discounted "wholesale" price directly from Young Living.  Second, Members do not earn any commissions on the PV they purchase from Young Living.   Instead, Members earn commissions only from (a) starter kits sold to newly recruited Young Living Members, and (b)

the Organizational Group Volume, or OGV, purchased by their down-line Members either recruited personally by them, or recruited by their down-line Members.  Importantly, no Member may earn a commission except through new member recruitment.

34.     And even more shocking is that Young Living doesn't even pay earned commissions to most of those lucky few who are able to amass a down line that purchases the minimum level of OGV each month.  To the contrary, if a Member's earned commission is less than $25 in a single month, Young Living will not pay that commission to the Member.  Instead, Young Living issues a credit, which can be used by the Member only to buy more product.  So if a Member's OGV isn't large enough each month to trigger a commission check, her only option is to recruit even more Members in hopes of driving up her OGV.

35.     This is not a system designed to sell product to those outside the pyramid.  Rather, the entire system is designed for one purpose:  to recruit new Members to grow the illegal pyramid.

36.     To support the pyramid's need to bring in new blood, Young Living presents its Members with a dizzying array of bonuses and other compensation benefits earned solely through the recruitment of additional Members.  And those benefits all come with Membership titles meant to falsely convey to new Members the promise of wealth—such as "Gold," "Platinum," and potentially, the elusive title of "Royal Crown Diamond."

37.     The problem is, these higher tiers are virtually unattainable.  In order to move up the pyramid and share in the abundance of promised riches, a Member's required minimum OGV increases dramatically.  For example, in order to earn the relatively low rank of "Star," a new Member must have an OGV of 500, and the Member's minimum PV of 100 doesn't count towards the 500 OGV.  In other words, a Member is required to recruit new Members to move

up the pyramid and earn commissions.  And because Members are not rewarded for additional PV purchased personally, the only conceivable way for a Member to move up in rank is by achieving the near impossible—*i.e.,* the creation of a down line consisting of *thousands of* recruits.

38.     Consider, for example, Young Living's highest rank of "Royal Crown Diamond." The required OGV is a staggering 1,500,000.  In order to meet an OGV of 1,500,000, a Member would need a down line of more than 15,000 members each purchasing the minimum PV.  And because attrition and failure to order minimum PV is not uncommon, it is likely a Member would actually need a down-line consisting of many multiples of that number.  Thus, it is not surprising that an infinitesimally small number of Members have ever actually achieved any meaningful success.  Indeed, while Young Living brazenly touts the achievement of becoming a "Royal Crown Diamond" as within the grasp of all of its Members, a mere 46 have ever achieved this goal.  Young Living claims it has 3,000,000 active Members, but does not report on the number of former Members.  Thus, only .0015% of active Members have made it to the top of the pyramid, and the percentage of all Members is very likely much, much smaller.

39.     Thus, the overwhelming majority of Young Living Members lose money by paying far more into the scheme than they receive, while those few at the top reap untold riches, funded by all of the lower level Members paying into the system.  This is the very definition of an illegal pyramid scheme.

### (2)     Young Living Members are Encouraged to Violate the 70/30 Amway Rule

40.     Beyond Young Living's overwhelming dependence on recruitment income, Young Living's status as an unlawful pyramid scheme is further evidenced by its brazen violation of the so-called 70/30 rule.  In the Federal Trade Commission's seminal 1979 *Amway* ruling, it concluded that Amway did not operate as a pyramid scheme, in part, because Amway

required its representatives to submit proof of resale demonstrating no more than 30% of purchased product was for personal use or storage before permitting its representatives to purchase additional product—thus the term "70/30."

41.     The 70/30 rule is designed to prevent an MLM from encouraging its Members to continuously order new product for sale (sometimes referred to as "inventory loading") in order to be eligible to earn commission.  Here, Young Living's compensation system actually requires its Members to inventory load product.  If a Member fails to meet her minimum monthly PV, she is not eligible to earn any commissions on her down line's OGV no matter how large that OGV may be.

42.     Young Living is well aware of the 70/30 rule.  Its policies and guidelines even say that no more than 30% of ordered PV can be stored prior to purchasing additional inventory.  But this is mere lip-service.  Young Living does absolutely nothing to enforce this policy, and is well-aware that it is routinely violated.  It has no method of compliance in place, and it requires no proof that its Members are actually selling their PV.  Any Member can order as much PV as she wants, whenever she wants.  And Young Living turns a blind eye, because doing so helps further its scheme.

43.     And, unlike MLMs that sell physically large products, which impedes inventory loading, the opposite is true of Young Living's products.  Young Living's oils are contained in small, easily stored vials, which actually facilitate inventory loading.  Most vials contain only 5 ML to 15 ML and each one can sell for $20+.  At that size and price, a single closet shelf would be enough space for a failing Young Living Member to store literally thousands of dollars in unsold product, hoping against hope that her down line OGV will grow large enough to trigger a meager commission.

**(3)     Young Living Is In Fact an Illegal Pyramid Scheme**

44.     By any measure, Young Living is unequivocally a pyramid scheme.

45.     Numerous government agencies, legal opinions and experts have all recognized that MLM companies like Young Living, which emphasize member recruitment over product sales, earn the majority of their revenue from member recruitment, and make no effort to enforce the "70/30" rule, are in fact illegal pyramid schemes.[7]

46.     Indeed, in 2015 the FTC sued Arizona based Vemma Nutrition Company in the District Court of Arizona for running an illegal pyramid scheme utilizing the exact pay structure and model utilized by Young Living.[8]

47.     In December 2016 Vemma admitted it was running an illegal pyramid scheme and agreed to a judgment which included $238 million in monetary damages, as well as an injunction which prohibits Vemma from, *inter alia*, engaging in the very same acts which the Defendants are engaging in here.[9]

48.     Specifically (and just like Vemma), the overwhelming majority of representatives will not even recoup the money that they paid to Young Living to become a Member and be part of Young Living's sales force.

49.     Conversely (and just like Vemma), Young Living's enormous revenue is largely staked in the money it receives from its own representatives to be part of the sales force, and the products its sales force are required to purchase to remain an active Essential Rewards enrollee.

---

[7] *See e.g., Stull v. YTB Intern., Inc.*, CIV. 10-600-GPM, 2011 WL 4476419, *5 (S.D. Ill. Sept. 26, 2011) (noting fact travel based pyramid scheme's revenues were largely derived from new recruits supported allegation it was a pyramid scheme).

[8] *See FTC v. Vemma Nutrition Co., et al.*, 15 CV 01578 –PHX (D. Ariz.) (ECF No. 1).

[9] *See* FTC Release "Vemma Agrees to Ban on Pyramid Scheme Practices to Settle FTC Charges." https://www.ftc.gov/news-events/press-releases/2016/12/vemma-agrees-ban-pyramid-scheme-practices-settle-ftc-charges (Dec. 15, 2016).

50.     Federal courts have recognized that the operation of a pyramid scheme such as Young Living constitutes fraud.  Pyramid schemes make money for those at the top of the pyramid and victimize those at the bottom who cannot find recruits.  Accordingly, pyramid schemes are inherently fraudulent.  The Defendants' operations are also a pyramid scheme because they are based on false promises of vast financial rewards, which are impossible to achieve for new Members who enter at the bottom of the pyramid and who have no realistic chance of moving up the ladder.

51.     Ultimately, the Members are financially induced by Defendants to recruit new representatives to join the sales force through materially false representations about the Young Living pyramid scheme.  By emphasizing recruitment over product sales, Young Living crosses the threshold from legitimate MLM into an illegal pyramid scheme.

52.     The rewards Members can achieve in this case are dependent on virtually endless recruitment into the scheme in which people are exploited and have virtually no chance to get a return on their investment, let alone achieve the high financial gains Defendants induced these representatives to believe they would achieve.  All of the Defendants participate in the illegal fraud through their statements and actions in furtherance of Young Living's operations as an illegal pyramid scheme.

**B.**     **Plaintiff's Experience Confirms Young Living is a Pyramid Scheme**

53.     In 2015, Julie joined Young Living as a Member, after attending a Young Living party hosted by a close friend.  Julie was initially interested in the quasi-medicinal claims associated with Young Living's oils, and was also persuaded the operation of a Young Living distributorship might at least cover the cost of paying approximately $100 for a "starter kit" and the right to resell Young Living products as a Member.

54.     Thereafter, Julie began making monthly payments to Young Living in order to satisfy her PV requirement, and to ensure she could receive both the potential commissions of her "down line" as well as the 24% wholesale discount on the product she was purchasing.

55.     Of course, like the overwhelming majority of Members, Julie found recruitment and sale of products difficult, if not impossible.  Indeed, since joining Young Living, Julie has only been able to recruit a handful of new Members as her "down-line," which makes her chances of even breaking even as a Young Living Member impossible.  But even with little success in recruiting down line members, Julie dutifully purchased her minimum 100 PV every month so she wouldn't lose the chance to earn a commission from her down line's OGV.  Julie bought product month after month whether she needed it or not (she didn't), and whether she had any hope of re-selling it to someone else (she couldn't) without Young Living ever questioning whether she was re-selling at least 70% of her purchases.

56.     By the time Julie realized she had been victimized by Young Living, she had purchased more than $4,700 worth of product, but "earned" a commission of only $385 from her down line.[10]  She estimates she has accumulated about 2-3 years' worth of product if she were to try to use it all herself, including at least one unopened bottle from her initial purchase way back in 2015.  Because the vials are so small, Julie had no clue how much inventory she had been loading in an effort to chase the elusive promise of down line commissions.

57.     Julie's experience is hardly an aberration.  The income statistics for Young Living confirm the fact that only an infinitesimal number of Members <u>ever</u> manage to make a profit. For example, the Young Living 2015 U.S. Income Disclosure Statement (the year Julie joined Young Living) states the average annual income for all Members in 2015 was $30, or

---

[10] Young Living never actually paid any commissions to Julie because she never earned more than $25 in any single month.  Instead, the earned commissions simply accrued to Julie's account.

approximately 1/3 the cost of joining and far less than the $100 monthly minimum payment required to maintain status as a commission-eligible ER Member.[11]

58.     According to the 2016 Young Living Disclosure Statement, the average annual income for all Members fell to $25, or approximately a 1/4 of the cost of joining the Young Living scheme.[12]

## VI.
### RACKETEERING VIOLATIONS (RICO)—WIRE AND MAIL FRAUD

**A.    Racketeering Activity**

59.     Defendants have engaged in a pattern of racketeering activity, here wire and mail fraud.

60.     Defendants made fraudulent promises regarding compensation and financial rewards in the forms of marketing materials, such as videos (posted on YouTube and throughout the internet), printed materials, other forms of internet advertising, and numerous in-person sales and recruitment meetings.  Some of the meetings held by Young Living in accordance with its scheme to defraud draw literally thousands of participants.[13]

61.     RICO requires that a "person" violate its provisions.  A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property.  18 U.S.C. § 1961(3).

---

[11] And remember, these "Member" statistics don't include former Members, whose net income would be less than $0.

[12] In 2018, Young Living (likely to obscure the fact they had been operating an illegal pyramid scheme) created a two-tiered membership system that distinguishes between "preferred customers" and "business builders." Preferred customers now pay for the right to receive discounts on Young Living products but do not recruit other Members or sell products.  Business builders continue to recruit new members and sell products in the hope of one day earning enough money to cover the enormous costs of being a Member.  As discussed *infra*, this action concerns the pyramid scheme operated by Young Living prior to 2018, and does not involve Young Living's transition to this new, two-tiered system—which is nothing more than an effort to obscure its unlawful business model by skewing the statistics in its income reporting statements.  Indeed, it only serves to underscore the fact Young Living operates as a pyramid scheme.

[13] For example, the 2019 Young Living International Grand Convention will be held in July 2019 at the Salt Palace Convention Center and Rice Eccles Stadium, with a capacity of nearly 50,000 participants.

B.     **The Enterprise**

62.     For purposes of this complaint, and pursuant to 18 U.S.C. § 1961(4), from at least as early as September 1996 and continuously thereafter, the "Enterprise" was an association in fact consisting of at least Young Living, Gary Young (now deceased), and Mary Young.  The Young Living Foundation joined the Enterprise in March 2003 and has remained active continuously since it joined.  Jared Turner joined the Enterprise in July 2012 and has remained active continuously since he joined.  Benjamin Riley joined the Enterprise in June 2016 and has remained active continuously since he joined.  Numerous other "Jane and John Doe" individuals are also members of the Enterprise.

63.     Each such person listed above is a "person" as defined in 18 U.S.C. § 1961(3).

64.     Such persons collectively constituted an "Enterprise" associating together for a common purpose of engaging in a course of racketeering activity (within the meaning of 18 U.S.C. § 1961(1)); *i.e.*, a group of individuals and entities associated in fact for the purpose of engaging in the operation of an illegal pyramid scheme by fraudulently inducing their victims to expend hundreds, if not thousands of dollars based upon fraudulent claims of profit, all for their own personal gain, through, *inter alia*, myriad acts of mail and wire fraud, all to accomplish the goals of the Enterprise.

65.     The Enterprise itself had a continuing, on-going structure, and functioned as a continuous unit with established duties separate and apart from the pattern of racketeering activity described here.

66.     Young Living, the Foundation, Gary Young, Young, Turner, Riley, and the numerous John and Jane Does involved were engaged in the conduct of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and as set forth below. Each committed at least two (2) acts of racketeering during the relevant time period.  Defendants

each committed multiple violations of mail and wire fraud.  18 U.S.C. §§ 1341 and 1343.  These incidents of racketeering activity had the same or similar results, participants, victims or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated incidents, and the last of such incidents occurred within weeks of a prior act of racketeering activity.

67.     The members of the Enterprise agreed to engage in a RICO conspiracy.  More specifically, the Enterprise was structured in the following manner, and the members and other persons or entities associated with and employed by the Enterprise, or in conspiracy with it or its members, agreed to function in the following roles:

a.     Gary Young created Young Living and the Foundation for the purposes of running the scheme, and promoted each, along with others, for the purpose of defrauding the overwhelming majority of Young Living Members who sit at the bottom of the Young Living pyramid scheme.  Young and other members of the RICO conspiracy used false and fraudulent pretenses to deceive Plaintiff and class members through materially misleading statements of fact and non-disclosure of important facts about Young Living.

b.     The Foundation participated in the scheme through its purported charitable endeavors, which provide the Enterprise with a patina of legitimacy.  Notably, nearly all pyramid schemes involve the creation of a foundation for this very purpose.

c.     The individual Defendants each participated in the operation of the Enterprise and performed a role that was essential to its operation and continued success.  Mary Young is a co-founder along with Gary Young, and currently acts as the Chief Executive Officer of Young Living and the Enterprise.  Since 2012, Jared Turner has served as the Chief Sales Officer, the Chief Sales and Marketing Officer, the Chief Operating Officer, and is currently the

President and COO of Young Living and the Enterprise.  Since 2016, Ben Riley has served as the Executive VP of Global Sales and is now the Chief Sales Officer of Young Living and the Enterprise.

d.      The success of the Enterprise's pyramid scheme would not be achieved but for the active, willing participation of each Defendant.  For example, Defendant Young wrote and created the fictional biography of Gary Young, through which the scheme's fraudulent promises of spiritual and financial "abundance" were developed.  Later, Young took over operation and management of the scheme.

e.      Likewise, numerous other individuals, including Turner and Riley, were responsible for the development of fraudulent marketing materials through which materially misleading statements of fact and non-disclosures of important facts are disseminated.

f.      The success of the Enterprise's fraudulent pyramid scheme made it possible for the members of the Enterprise to enjoy substantial illegal financial benefits through the fraudulent payment of enormous sums by Young Living Members to be part of the Young Living pyramid scheme.

68.      Through this enterprise, significant harm has been and continues to be endured by unsuspecting Members.

## C.      Pattern of Overt Acts of Racketeering

69.      In order to effect the illegal objectives of the Enterprise, Young Living, the Foundation, Gary Young, Young, Turner, Riley, and other known and unknown members of the Enterprise committed, either directly or indirectly, thousands upon thousands of overt acts of wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.  The Enterprise's daily operations require use of the wires and mails.  Young Living publishes a website that is hosted in New York and disseminated electronically across the wires to millions of users located

throughout the United States.  The website is used to both advertise the pyramid scheme by promoting its many mythical benefits, and to operate the pyramid scheme through on line purchases of product.

70.     The Enterprise promotes its pyramid scheme using emails, electronic newsletters, Facebook, and videos posted to hosting sites like YouTube and vimeo.  The Enterprise sends emails electronically to its Members using interstate wires from news@younglivingcomms.com to promote advertising campaigns, such as live Facebook feeds.  The Enterprise also hosts a virtual office that allows Members to send mass marketing emails through one or more Young Living email servers that electronically distribute emails to all Members from domains including NO-ReplyYoungLiving@bold.com  and  custserv@youngliving.com.    The product that the Enterprise requires all ER enrollees to purchase monthly is distributed to the Members via United States mail and private interstate couriers.  The Enterprise's countless acts of wire and mail fraud have taken place thousands of times every day for over two decades; they undoubtedly demonstrate continuity and relationship and constitute a pattern of racketeering activity because: (1) they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and not isolated events; and (2) they consisted of a series of related predicate acts that extended over a substantial period of time.

71.     By engaging in the conduct described herein, Defendants were members of the Enterprise who committed specific predicate acts.  Through the predicate acts and other acts stated herein, the Foundation and the Individual Defendants agreed and intended to further an endeavor of Young Living which, if completed, would satisfy all of the elements of a substantive RICO offense (18 U.S.C. § 1962(c)), and adopted the goal of furthering or facilitating the

endeavor in violation of 18 U.S.C. § 1962(d). For example, but without limitation, Young Living operates the website and email servers used to promote and operate the illegal pyramid scheme. Ben Riley designs, operates, and maintains the sales and marketing materials that are used to promote the illegal pyramid through the mails and interstate wires. Jared Turner and Mary Young design, operate, and maintain the overall structure of the pyramid, which is promoted and operated through the mails and interstate wires. The Foundation assists in promoting and marketing the illegal pyramid scheme through the mails and interstate wires.

72. The following specific overt acts are merely examples of the thousands upon thousands of predicate acts committed by Defendants:

WIRE FRAUD

**Overt Act No. 1.**

73. On October 14, 2015, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York. As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using account credits and credit card. The order was placed and payment was made in the amount of $126.82 via the use of interstate wires. Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

**Overt Act No. 2.**

74. On October 21, 2015, Young Living sent a mass marketing email from customerservice@youngliving.com to Julie and thousands of other Members throughout the United States using interstate wires. This email contained imbedded hyperlinks to web-hosted articles promoting the illegal pyramid scheme, including a list of live cult-like events during which fever-pitched-speakers attempt to motivate the faithful into recruiting more and more

members.  The imbedded hyper-links pointed back to Young Living's New York hosted website. Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 3.**

75.    On November 5, 2015, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment was made in the amount of $129.07 via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

**Overt Act No. 4.**

76.    On December 13, 2015, Young Living sent an email from custserv@youngliving.com to Julie via United States interstate wires.  This email contained a confirmation of an online order that Julie had placed for the purchase of product from Young Living's website.  Julie's purchase of product was made to maintain her active enrollment in ER, and Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 5.**

77.    On January 4, 2016, Young Living sent an email from custserv@youngliving.com to Julie via United States interstate wires.  This email contained a confirmation of an online order that Julie had placed for the purchase of product from Young Living's website.  Julie's purchase of product was made to maintain her active enrollment in ER, and Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 6.**

78.     On January 13, 2016, a Young Living Member doing business as Choosing Healthy Life, Inc. sent a mass marketing email to Julie and all other Members throughout the United States using the Young Living virtual office listserv, noreply@youngliving.com.   The purpose of this email was to promote various live events, where speakers try to convince Young Living Members that they can live an "abundant life" by recruiting new members for the illegal pyramid.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 7.**

79.     On February 18, 2016, Young Living sent a mass marketing email from customerservice@youngliving.com to Julie and thousands of other Members throughout the United States using interstate wires.  This email contained imbedded hyperlinks to web-hosted articles promoting the illegal pyramid scheme, including a list of live cult-like events during which fever-pitched-speakers attempt to motivate the faithful into recruiting more and more members.  The imbedded hyper-links pointed back to Young Living's New York hosted website. Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 8.**

80.     On July 22, 2016, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment in the amount of $112.09 was made via the use interstate wires.   Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

**Overt Act No. 9.**

81.     On November 1, 2016, a Young Living Member doing business as Essential Families, LLC sent a mass marketing email to Julie and other Members throughout the United States using the Young Living virtual office listserv, noreply@youngliving.com.  The purpose of this email was to advertise a Young Living promotion that offered rewards for new member signups:  "Enroll 25 new members . . . and receive a Young Living branded iPad Pro (retail value $599)!"  "AND the top 2 enrollers will win an all-expense paid trip to Ecuador with the Young Living foundation!!"  The email also invited Members to join the "Business Builders group on Facebook," which promotes recruitment of new Members as a business model.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 10.**

82.     On May 4, 2017, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment in the amount of $125.05 was made via the use interstate wires.   Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

**Overt Act No. 11.**

83.     On June 27, 2017, a Young Living Member doing business as Max and Karen Hopkins, LLC sent a mass marketing email to Julie and the other Members throughout the United States using the Young Living virtual office listserv, noreply@youngliving.com.  The purpose of this email was to promote a live event taking place in Tulsa, Oklahoma during October 2017, which was described as "a motivating event designed to take your business to the

next level and beyond."  Of course, the only way to move to the next level in the Young Living pyramid is to recruit new members, and this event was advertised as offering "empowering speakers [who] will help you discover how to take action regarding . . . business building." "Business building" is Young Living's euphemism for recruiting more Members.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 12.**

84.     On September 8, 2017, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment was made in the amount of $120.06 via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

**Overt Act No. 13.**

85.     On April 30, 2018, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment was made in the amount of $145.86 via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

**Overt Act No. 14.**

86.     On December 24, 2018, a Young Living Member doing business as Choosing Healthy Life, Inc. sent a mass marketing email to Julie and the other Members throughout Texas using the Young Living virtual office listserv, noreply@youngliving.com, which is hosted on

servers in New York.  The purpose of this email was to promote a live event taking place in the Woodlands, Texas during January 2019, which was described as "a full day of Young Living . . . inspiration, goal setting for 2019 and more with special speakers . . . ."  Of course, "goal setting" in the Young Living pyramid means only one thing:  recruit more members.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Overt Act No. 15.**

87.    On January 28, 2019, Young Living hosted a Facebook Live event on its Training and Education Facebook page.  This was a live event broadcast to Members throughout the United States via Facebook's platform using interstate wires.  In this event, Young Living offered training by Casey Weigand, "who shar[ed] insider tips on how to attract new members and help them successfully launch their new business" of recruiting more new Members.  This Facebook Live event was promoted via a mass marketing email sent to Julie and the other Members throughout the United States directly from Young Living using its news@younglivingcomms.com email domain.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

**Additional Overt Acts.**

88.    Each and every day from at least October 2015 through the present, the Defendants used or caused to be used the interstate wires multiple times daily to promote and operate the illegal pyramid scheme through the Enterprise.  The total number of overt violations of wire fraud were undertaken specifically in furtherance of the illegal pyramid scheme.

MAIL FRAUD

**Overt Act No. 1.**

89.    On May 16, 2015, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order

placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

**Overt Act No. 2.**

90.     On May 16, 2015, Defendants sent to Julie a monthly newsletter entitled "The Essential Edge" using a private interstate courier.  The newsletter is published by Defendants and includes promotional/marketing materials designed to promote the illegal pyramid scheme. Among other items in the newsletter, there was a profile of a "Diamond" level Member who claimed that Young Living provided "financial freedom" to her and her husband, and an advertisement for the 2015 International Grand Convention, "Light the Fire," to be held in Dallas, Texas in August of 2015.  Defendants' use of the private interstate courier to disseminate the newsletter was in furtherance of their illegal pyramid scheme.

**Overt Act No. 3.**

91.     On July 6, 2015, Defendants sent to Julie a monthly newsletter entitled "The Essential Edge" using a private interstate courier.  The newsletter is published by Defendants and includes promotional/marketing materials designed to promote the illegal pyramid scheme. Among other items in the newsletter, there was a "Founder's Message" column, in which Gary Young promoted Young Living as "a remarkable avenue to pursue and realize your biggest dreams.  Imagine your life with the financial freedom [and] time freedom . . . you've only dreamed of.  That's the Young Living lifestyle."  There's also a "Building Your Business" column that encourages recruitment of new members by "be[ing] vulnerable and real with them," and touts "the financial blessings of being Young Living members."  Defendants' use of the

private interstate courier to disseminate the newsletter was in furtherance of their illegal pyramid scheme.

**Overt Act No. 4.**

92.     On October 14, 2015, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales. Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

**Overt Act No. 5.**

93.     On December 5, 2015, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales. Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

**Overt Act No. 6.**

94.     On July 22, 2016, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

**Overt Act No. 7.**

95.     On May 4, 2017, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on

her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

**Overt Act No. 8.**

96.     On October 27, 2017, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

**Overt Act No. 9.**

97.     On April 30, 2018, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales. Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

**Overt Act No. 10.**

98.     On August 25, 2018, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales. Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

**Additional Overt Acts.**

99.     Each and every month from at least October 2015 through September 2018, Defendants sent to Julie a shipment of oils plus a monthly newsletter.  Most of the shipments were made using the United States mails, with a handful having been made through private interstate couriers such as Fed Ex or UPS.  The specific dates included in the foregoing

paragraphs were taken from a handful of documents still in Julie's possession, but she knows and therefore alleges that these shipments took place each and every month.

100.    Upon information and belief, Defendants used the mails and/or private interstate couriers to send oils and newsletters to the Young Living members just like Julie who placed order after order, hoping against hope to move up the Young Living pyramid.  Each one of these countless shipments was made in furtherance of the illegal pyramid scheme and constitutes the predicate act of mail fraud.

**D.**    **Interstate Commerce**

101.    Defendants have engaged in activities that affect interstate commerce.

102.    Defendants have transmitted, caused to be transmitted, or invited others to transmit materials, by mail or private or commercial carriers, for the purpose of executing their scheme or artifice to defraud in violation of 18 U.S.C. § 1341.

103.    Defendants have transmitted, caused to be transmitted, and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice to defraud in violation of 18 U.S.C. § 1343.

## VII.
### CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this suit as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

105.    The class is defined as follows:

**All United States residents who joined Young Living prior to December 31, 2016 and enrolled as Essential Rewards members.  The following are excluded from this class:  Defendants and their officers, directors, counsel, and subsidiaries, along with immediate family members of individual Defendants.**

106.    The putative class easily meets Rule 23(a)'s numerosity requirement.  Indeed, the class is believed to number well over one hundred thousand members.

107.    Plaintiff's claims are typical of the claims of the class in that each became a Young Living Member because each was unsuspectingly induced to join the pyramid scheme.

108.    This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

109.    The questions of law and/or fact common to the class include, but are not limited to:

        a.      Whether Defendants were operating an unlawful pyramid scheme;

        b.      Whether Defendants' unlawful operation of a pyramid scheme violates 18 U.S.C. § 1961(5);

        c.      Whether Defendants engaged in a conspiracy to violate 18 U.S.C. § 1961(5);

        d.      Whether Defendants engaged in acts of mail and/or wire fraud when operating the Young Living pyramid scheme;

        e.      Whether Defendants are liable to the class as a result of their participation in the Young Living pyramid scheme; and

        f.      Whether the class has sustained damages, and if so, what is the measure of damages.

110.    Plaintiff will fairly and adequately represent the interests of the class because Plaintiff's claims are typical of those of the class and Plaintiff's interests are fully aligned with

those of the class.  Plaintiff has retained attorneys that are experienced and skilled in complex class action litigation.

111.    Class action treatment is superior to any other method of proceeding for the fair and efficient adjudication of the controversy alleged herein because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

112.    Defendants have acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. If Plaintiff proves Defendants operate a pyramid scheme in violation of the RICO Act, the Court should enjoin Defendants from operating that pyramid scheme in the future.

113.    The questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members.

114.    Finally, a class action under Federal Rule of Civil Procedure 23(b)(3) is superior because:

a.      No class member has an interest in individually controlling the prosecution of his/her/its separate action.  No class member can be expected to incur the cost of attorneys' fees and costs to recover the amounts spent by each to join Young Living and operate as a Member of Young Living.  While such amounts are significant to each Member, they are not enough to justify the costs of litigation individually, and no one would chose to do so on that basis;

b.      There is no other pending litigation over these issues;

c.     It is manifestly desirable to concentrate the litigation of the class' claims in Texas and this district; and

d.     The Court will encounter no difficulties in managing this case as a class action.

## VIII.
### CAUSES OF ACTION

### Count One
**(Violations of 18 U.S.C. §§ 1961(5), 1962(c))**
**(All Defendants)**

115.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

116.     Defendants are an enterprise engaged in activities that affect interstate commerce.

117.     Each Defendant has created and/or participated in the operation or management of the Young Living pyramid scheme through a pattern of racketeering activity, *i.e.*, conducting the affairs and supporting the acts of the pyramid scheme.  These persons have authorized and participated in the use of mail, email, websites, web presentations, live internet broadcasts, web-hosted videos, conferences, conference calls, and speeches in order to promote this pyramid scheme.

118.     Young, the Foundation, Turner, Riley, and other unnamed John and Jane Doe co-conspirators have some part in the conduct of Young Living and its pyramid scheme as they control and direct the conference calls, websites, web presentations, speeches, mail transfers, and other activities, or direct others who conduct such activity.

119.     Further, Young Living has authorized the Foundation, Young, Turner, Riley, and others who operate at their direction, to conduct these conference calls, websites, web presentations, speeches, mail transfers, and other activities, as well to direct and control the marketing of Young Living's business activities.  Moreover, each is authorized to use Young Living's name and service marks and to speak on its behalf.

### Count Two
### (Violation of 18 U.S.C. § 1962(d)—Conspiracy to Violate 18 U.S.C. § 1962(c))
### (All Defendants)

120.     Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

121.     Defendants have participated in a conspiracy to engage in the activities described in Count One above.  Each Defendant knew about and agreed to facilitate the pyramid scheme.

122.     Each Defendant has participated in the Young Living pyramid scheme, and their participation is necessarily a combination of more than two individuals.

123.     Defendants' creation, support, operation and/or maintenance of the pyramid scheme is illegal.

124.     Defendants had a meeting of the minds on the object or course of action, specifically to create, support, operate, and/or maintain the pyramid scheme for their financial benefit as evidenced by each Defendant's voluntary and knowing participation in the pyramid scheme.

125.     Each Defendant has committed one or more overt acts to achieve or further the unlawful objects and purposes of the pyramid scheme detailed herein.

126.     Defendants used false and fraudulent pretenses to deceive persons of ordinary prudence and due care, and made material nondisclosures and concealments of fact and

information that were important to understand their pyramid scheme. Defendants conducted their affairs unlawfully, intentionally, willfully, and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all to the detriment of Plaintiff and other members of the class.

## IX.
### JURY DEMAND

127.    Plaintiff and putative class demand a trial by jury.

## X.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the putative class pray for judgment against Defendants as follows:

a.    An order certifying the putative class;

b.    A judgment against Defendants;

c.    Damages in the amount of the financial losses incurred by Plaintiff and class members as a result of Defendants' conduct and for injury to their business and property, all as result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), and that such sum be trebled in accordance with 18 U.S.C. § 1964(c).

d.    Temporary and permanent injunctive relief enjoining Defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including but not limited to supporting the pyramid scheme;

e.    The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c);

f.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

Respectfully submitted,

**NIX PATTERSON, LLP**
3600 N Capital of Texas Highway
Suite B350
Austin, Texas 78746
(512) 328-5333 (telephone)
Austin Tighe
State Bar No. 20023900
atighe@nixlaw.com

**DUGGINS WREN MANN & ROMERO, LLP**
600 Congress Avenue, Ste. 1900
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300 (telephone)
Robert E. Linkin
State Bar No. 00795773
rlinkin@dwmrlaw.com

**DuBOIS, BRYANT & CAMPBELL, LLP**
303 Colorado Street, Suite 2300
Austin, TX  78701
(512) 457-8000 (telephone)
J. David Rowe
State Bar No. 00794564
drowe@dbcllp.com


By: _    /s/ Austin Tighe_
       Austin Tighe
       atighe@nixlaw.com

**ATTORNEYS FOR PLAINTIFF**
**Julie O'Shaughnessy, Individually, and on**
**Behalf of All Others Similarly Situated**

# EXHIBIT A

# YOUNG LIVING 2016 U.S. INCOME DISCLOSURE STATEMENT

As a direct selling company selling essential oils, supplements, and other lifestyle products, Young Living offers opportunities for our members to build a business or simply receive discounts on our products.

Whatever your interest in the company, we hope to count you among the more than 2 million Young Living members joining us in our mission to bring Young Living essential oils to every home in the world.

**What are my earning opportunities?**

Members can earn commissions and bonuses as outlined in our Compensation Plan. As members move up in the ranks of Young Living, they become eligible for additional earning opportunities.

This document provides statistical, fiscal data about the average member income and information about achieving various ranks.



YOUNG LIVING
ESSENTIAL OILS

| RANK | PERCENTAGE OF ALL MEMBERS[3] | MONTHLY INCOME[4] | | | | ANNUALIZE AVERAGE INCOME[5] | MONTHS TO ACHIEVE THIS RANK[6] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Lowest | Highest | Median | Average | | Low | Average | High |
| Distributor | 94.0% | $0 | $841 | $0 | $1 | $12 | N/A | N/A | N/A |
| Star | 3.5% | $0 | $811 | $60 | $77 | $924 | 1 | 15 | 255 |
| Senior Star | 1.3% | $1 | $5,157 | $197 | $240 | $2,880 | 1 | 22 | 255 |
| Executive | 0.6% | $50 | $12,139 | $434 | $514 | $6,168 | 1 | 29 | 253 |
| Silver | 0.2% | $562 | $25,546 | $1,783 | $2,227 | $26,724 | 1 | 36 | 251 |
| Gold | 0.1% | $1,781 | $46,820 | $4,874 | $6,067 | $72,804 | 1 | 54 | 240 |
| Platinum | < 0.1% | $5,146 | $85,993 | $12,188 | $15,324 | $183,888 | 2 | 63 | 238 |
| Diamond | < 0.1% | $14,898 | $140,333 | $32,078 | $39,566 | $474,792 | 10 | 75 | 251 |
| Crown Diamond | < 0.1% | $37,227 | $232,551 | $64,256 | $74,188 | $890,256 | 14 | 83 | 236 |
| Royal Crown Diamond | < 0.1% | $58,392 | $262,864 | $155,248 | $152,377 | $1,828,524 | 17 | 106 | 230 |

The income statistics in this statement are for incomes earned by all active U.S. members in 2016. An "active" member is a member who made at least one product purchase in products in the previous 12 months. The average annual income for all members in this time was $25, and the median annual income for all members was $0. 51% of all members who enrolled in 2015 did not make a purchase with Young Living in 2016. 57% of all members who enrolled in 2014 did not continue with Young Living in 2016.

Note that the compensation paid to members summarized in this disclosure do not include expenses incurred by a member in the operation or promotion of his or her business, which can vary widely and might include advertising or promotional expenses, product samples, training, rent, travel, telephone and Internet costs, and miscellaneous expenses. The earnings of the members in this chart are not necessarily representative of the income, if any, that a Young Living member can or will earn through the Young Living Compensation Plan. These figures should not be considered as guarantees or projections of your actual earnings or profits. Your success will depend on individual diligence, work, effort, sales skill, and market conditions. Young Living does not guarantee any income or rank success.

[1] Based on a count of all active members in 2016.
[2] Because a distributor's rank may change from during the year, these percentages are not based on individual distributor ranks throughout the entire year, but based on the average distribution of distributor ranks during the entire year.
[3] Because a distributor's rank may change from during the year, these incomes are not based on individual distributor incomes throughout the entire year, but based on earnings of all distributors qualifying for each rank during any month throughout the year.
[4] This is calculated by multiplying the average monthly incomes by 12.
[5] These statistics include all historical ranking data for each rank and thus is not limited to people who achieved these ranks in 2016.
[6] These incomes include income earned from January 1, 2016, and December 31, 2016, but which was paid between February 2016 and January 2017.
[7] Members who do not make at least one product purchase in the previous 12 months have their membership terminated.